IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION

| | | |
|---|---|---|
| BURNS, MORRIS & STEWART LIMITED PARTNERSHIP, | § § § | |
| *Plaintiff*, | § § | Civil Action No. 9:04-CV-23 |
| v. | § § | JUDGE RON CLARK |
| ENDURA PRODUCTS, INC., | § § | |
| *Defendant*. | § | |

## MEMORANDUM OPINION AND ORDER CONSTRUING CLAIM TERMS OF UNITED STATES PATENT NO. 5,873,209

Plaintiff Burns, Morris & Stewart Limited Partnership ("BMS") filed suit claiming infringement of two patents. Endura Products, Inc. ("Endura") counterclaimed on the two patents. BMS amended its complaint and the parties have entered into a stipulation whereby the only patent at issue is United States Patent No. 5,873,209 ("'209" patent. The only claims at issue are claims 2 and 8. On April 26, 2005 the court conducted a hearing for the purpose of hearing evidence and argument that would assist the court in interpreting the meaning of certain disputed claims of the '209 patent. Having carefully considered the parties' briefs, the testimony, and exhibits admitted into evidence, the referenced patents, and the arguments of counsel, the court now makes the following findings and construes the disputed claims as follows.

### I. STANDARD FOR REVIEWING CLAIM TERMS

In *Markman v. Westview Instruments, Inc.,* 52 F.3d 967 (Fed. Cir. 1995) ("*Markman I*"), the Federal Circuit held that claim construction is a matter of law. In affirming this decision, the Supreme Court in *Markman v. Westview Instruments, Inc.*, 116 S. Ct. 1384 (1996) ("*Markman II*"), stated, "[w]e hold that the construction of a patent, including terms of art within its claims,

is exclusively within the province of the court." *Id.* at 1387. "[J]udges, not juries, are the better suited to find the acquired meaning of patent terms." *Id.* at 1395.

> The duty of the trial judge is to determine the meaning of the claims at issue, and to instruct the jury accordingly. In the exercise of that duty, the trial judge has an independent obligation to determine the meaning of the claims, notwithstanding the views asserted by the adversary parties.

*Exxon Chem. Patents, Inc. v. Lubrizoil Corp.*, 64 F.3d 1553, 1555 (Fed. Cir. 1995) (citations omitted).

In performing this duty, this court is guided by several principles. The claims should be construed in light of the ordinary meaning of the claim language, as well as the patent specification and prosecution history. *Markman I*, 52 F.3d at 979-80; *see also Vitronics Corp. v. Conceptronic, Inc.* 90 F.3d 1576, 1582 (Fed. Cir. 1996).

The court should first determine the ordinary meaning of a disputed term. There is a "heavy presumption" that the terms used in claims "mean what they say and have the ordinary meaning that would be attributed to those words by persons skilled in the relevant art." *Tex. Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1202 (Fed. Cir. 2002).

It is well established that courts are to determine the plain, ordinary meaning of a claim term *before* turning to the specification. As the Federal Circuit has stated:

> [C]onsulting the written description and prosecution history as a threshold step in the claim construction process, *before* any effort is made to discern the ordinary and customary meanings attributed to the words themselves, invites a violation of our precedent counseling against importing limitations into the claims."

*Tex. Digital*, 308 F.3d at 1204 (emphasis supplied).

It is entirely appropriate for a court to look to dictionaries to determine the plain and ordinary meaning of a disputed claim term. *Id.* at 1202.

> A dictionary is not prohibited extrinsic evidence, and is an available resource of claim construction. Although a dictionary definition may not enlarge the scope of a term when the specification and the prosecution history show that the inventor, or recognized usage in the field of the invention, have given the term a limited or specialized meaning, a dictionary is often useful to aid the court in determining the correct meaning to be ascribed to a term as it was used.

*Vanguard Prods. Corp. v. Parker Hannifin Corp.*, 234 F.3d 1370, 1372 (Fed. Cir. 2000).

Then, the court should look to the intrinsic evidence of record, that is, the patent specification, and, if in evidence, the prosecution history, to determine whether the patentee clearly intended a meaning different from the ordinary meaning or whether he clearly disavowed the ordinary meaning in favor of some special meaning. *See Markman I*, 52 F.3d at 979.

Claim terms take on their ordinary and accustomed meanings unless the patentee demonstrated "clear intent" to deviate from the ordinary and accustomed meaning of a claim term by redefining the term in the patent specification. *Johnson Worldwide Assoc., Inc. v. Zebco Corp.*, 175 F.3d 985, 990 (Fed. Cir. 1999).

> Claims must be read in view of the specification, of which they are a part. The specification contains a written description of the invention that must enable one of ordinary skill in the art to make and use the invention. For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims.

*Markman I*, 52 F.3d at 979 (internal citations omitted).

The Federal Circuit offered guidance on how the written description can be helpful in determining the meaning of claims:

> While it is true, of course, that 'the claims define the scope of the right to exclude' and that 'the claim construction inquiry, therefore, begins and ends in all cases with the actual words of the claim,' . . . the written description can provide guidance as to the meaning of the claims, thereby dictating the manner in which the claims are to be construed, even if the guidance is not provided in explicit definitional format.

*Scimed Life Sys. v. Advanced Cardiovascular*, 242 F.3d 1337, 1344 (Fed. Cir. 2001) (internal citations omitted).

The patentee may also deviate from the plain and ordinary meaning by characterizing the invention in the prosecution history using words or expressions of manifest exclusion or restriction, representing a "clear disavowal" of claim scope. *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002). However, absent a "clear indication" from the patent specification or a "clear disavowal" in the prosecution history; there is a "heavy presumption" that a claim term is given its plain and ordinary meaning. *Tex. Digital*, 308 F.3d at 1202.

Extrinsic evidence may be considered if needed to assist in determining the meaning or scope of technical terms in the specification or claims to one of ordinary skill in the art. *Vitronics*, 90 F.3d at 1583.

## II. CLAIM CONSTRUCTION

### A. The '209 Patent

United States Patent No. 5,873,209 was invented by Richard Hagel. The assignee is Burns, Morris & Steward Limited Partnership. The '209 patent refers to a process for making "engineered" wood. In general, this involves joining short pieces of lumber to make long pieces

which are used in construction. The joints are almost indiscernible to visual inspection, but the grain of the adjoining pieces does not match. Therefore, the resulting product is not suitable for fine cabinetry and high end products which are stained. However, the end product is about as strong as a similar length of solid lumber, and for all intents and purposes can be used in the same way as a similar piece of lumber.

The '209 patent was filed as a continuation patent of United States Patent No. 5,661,943, invented by Richard Hagel and assigned to BMS. The '209 patent replaces the piece at the bottom of a component, for example the side jamb of a door frame, with a piece made from another material which is moisture and insect resistant.

The abstract of the patent describes the invention as the following:

> A construction component for improved moisture, decay and insect resistance. The component preferably includes a plurality of members of which certain portions are comprised of materials resistant to moisture, decay and insects. The resistant member(s) are integrally connected to wood portion(s) to provide a single, low cost structure.

**B. Claim 2**

The first claim in dispute is claim 2. Claim 2 is dependent on claim 1. These claims are set out with the disputed terms highlighted in **BOLD**.

Claim 1 reads: A **frame**, comprising: a **top jamb**; two **side jambs** having **upper and lower portions** that are **integrally formed**, said upper portion being made of wood, said lower portion being a **durable moisture, decay, and insect resistant material** made from a second material.

Claim 2 reads: The frame of claim 1, wherein said second material is **plastic**.

5

### 1. Claim 1, Element 1, "frame"

To define frame, BMS proposes: "A pre-assembled unit with a top jamb, and two side jambs that is ready for insertion into a door opening in a wall." Endura proposes that the definition be merely: "Spaced vertical side jambs connected at the top by a horizontal top jamb, and excluding a sill."

Both sides agree that a frame has a top jamb and two side jambs, which is in the language of the claim itself. The points of contention are whether one skilled in the art would understand from the definition that the frame is pre-assembled, whether it is ready for insertion into a door opening, and whether it would exclude a sill.

The patentee did not demonstrate a clear intent to deviate from the ordinary and accustomed meaning of the term "frame" by redefining the term in the specifications. *See Johnson Worldwide*, 175 F.3d at 990. Such a claim should be read in accordance with precepts of English grammar, and with the presumption that the ordinary and accustomed meaning attributed to the term, by those skilled in the art, is correct. Of course the claim should be read in view of the specification, which cannot expand the scope of the claim, but can provide guidance as to its meaning.

Endura's proposed definition incorporates language from Col. 2, l. 25-27: "The door frame F is comprised of spaced vertical side jambs 1 and 2 connected together at the top by a horizontal top jamb." BMS uses the same language at page 13 of its initial brief on claim construction. While a description of a preferred embodiment is instructive, it is not, per se, a definition of a claim term.

The first point of contention is whether, in the context of this claim, a "frame" is pre-assembled. Neither claim 1, the independent claim, nor claim 2, the dependent claim, refer to a

kit with parts for a frame, or to a group of separate parts which may be put together into a frame. The claim starts with "A frame comprising . . . ." Endura's own proposed definition states: "side jambs connected together at the top by a horizontal top jamb . . . ." Even Endura does not propose a set or group of parts, or a kit containing parts, which may be assembled into a frame. It seems evident that until the parts are connected or assembled, there is no frame, so a "frame" must be already assembled or pre-assembled.

The abstract, drawings, and specification comport with this interpretation. The abstract states that the members are connected to provide "a single, low cost structure." Figure 1 shows a complete door frame. The "Background of the Invention" describes providing builders with completed frames, built from scrap lumber, which can be installed more easily, and cheaply installed than a custom frame. There is no indication anywhere that the claim was intended to cover, or could cover, a kit or group of parts which could be sold to a builder and assembled into a frame.

Finally, a definition that states that a "frame" is an assembled unit, or is something composed of parts connected together, tracks the definitions found in standard dictionaries relied upon by Endura. *See* Meriam-Websters Collegiate Dictionary 462 (10th ed. 2002) ("something composed of parts and **fitted together and united**") (emphasis added); Websters Encyclopedic Unabridged Dictionary of the English Language 563 (1989) ("a rigid structure formed of relatively slender pieces **joined** so as to surround . . . .") (emphasis added).

BMS's proposed definition also adds the phrase "ready for insertion into a door opening in a wall." Nothing in the claim language indicates, or even hints, that the frame is ready to be inserted into a wall opening. There is no telling what type of additional hardware, spacers, fasteners, and lumber might be needed to prepare a hole in the wall, or the frame itself, for

7

installation. Col. 3, l. 14-17, indicates that in the preferred embodiment a door frame would be ready for placement into a door opening, but the claim language is not so limited, and this language will not be added to the definition.

On the other hand, Endura's proposed definition includes the words "and excluding a sill." The claim language sets out clearly what comprises the frame, namely a top jamb and two side jambs. It would be possible to list dozens of other items which are not part of the frame, such as the door, the door knob, the hinges, the insulation around the frame, etc., but that would not add much clarity to the definition. Endura's attorney indicated that inclusion of the language might be helpful in an anticipated patent dispute, but that matter can be resolved when it arises. Therefore, the court interprets this term as follows:

> "**frame**" means: "an assembled structure composed of two spaced side jambs connected together at the top by a horizontal top jamb."

### 2. Claim 1, Element 2, "top jamb"

The parties agree on the following definition:

"The upper horizontal member of a frame that connects between two spaced side jambs."

### 3. Claim 1, Element 3, "side jamb"

The parties agree on the following definition:

"One of two vertical members of a frame that are spaced apart from one another and are each connected to a top jamb."

### 4. Claim 1, Element 4, "upper and lower portions"

BMS defines "upper and lower portions" in some detail as follows:

> "The upper portion of a side jamb is that portion which is in contact on an upper end with a top jamb and whose lower end is protected by the lower portion from environmental factors. The lower portion is that portion of a side jamb in contact with the lower end of an upper portion, that substitutes a material other than natural wood for what would other wise be natural wood in a standard side jamb thereby protecting the lower end of the upper portion from environmental factors."

Endura counters with a three-part proposal, in which:

(a.) "'Portion' means some part that is less that the whole;" (b.) "'Upper' means that it is relatively vertically higher than a portion that is lower;" and

(c.) "'Lower' means that it is relatively vertically lower than a portion that is upper."

BMS's proposal would use the definition of three words to describe virtually the entire invention. If this definition were accepted there would be no need for anything in claim 1 after the words "integrally formed." Endura's proposal is somewhat circular, as it describes "upper" as above "lower" and "lower" as above "upper," which is an inherent problem in defining some very basic words which indicate relative position.

The claim describes "upper and lower portions" in the context of side jambs, which by their nature are understood to be vertical. Not every word in a patent is a technical term, and the common meaning of "upper" is "higher in physical position." Meriam-Websters Collegiate Dictionary 1294 (10th ed. 2002); *see also* Websters Encyclopedic Unabridged Dictionary of the English Language 1570 (1989) ("higher, as in place . . . ."). In some contexts it might not even

be necessary to provide the jury with a definition of such words, as they could simply be instructed that words which are not defined are to be given their common everyday meaning.

However, in this case, underlying technology could make the terms "upper" and "lower" confusing, without a definition. This is because the side jambs are "engineered," that is, constructed from a number of pieces of wood. The invention simply uses a durable material to replace the lowest of the pieces which are joined together to produce the jamb. Therefore, there may be any number of pieces of wood which may be higher than, or above, other pieces, when the jamb is in place. It would not be helpful to leave an inference that the durable material of this invention could be one of the intermediate pieces. Therefore the court defines these claim terms as follows:

> "**upper portion**" means: "that part of the jamb, which is less than the whole, made up of one or more pieces joined together, and which is higher in physical position in the jamb than the lower portion."
>
> "**lower portion**" means: "the part of the jamb different than the upper portion, which is joined to the lower end of the upper portion."

### 5. Claim 1, Element 5, "integrally formed"

Earlier patents had been issued for wooden building components and substitutes for whole pieces of lumber, which were constructed, or engineered from smaller pieces. These involved joining pieces of wood together, to form larger, usable pieces, which were not intended to be disassembled, although they could be cut and shaped like solid pieces of lumber. *See e.g.* United States Patent No. 5,074,092 ("092" or "Norlander"). The patent in dispute describes a similar process, but includes the addition of a "second portion" made of a moisture and insect resistant material. However, it is clear from the claim language, the rest of the specification, and

the drawings, that what is described and intended is a frame with side jambs which are constructed as single complete pieces - for all intents and purposes as though they were made from single pieces of lumber.

    BMS proposed the following definition for "integrally formed":

"Referring to the attachment of the upper and lower portions of a side jamb such that the upper and lower portions are attached to one another so as to achieve a completed side jamb."

Endura's proposed definition is:

"Shaped or formed into a single, indivisible, whole unit, as opposed to an assembly of components attached with removable fasteners, such as screws or staples."

    At the *Markman* hearing counsel for Endura agreed that its use of "formed" in the definition of integrally formed could be considered circular, although counsel later noted that some dictionaries use a word to define itself. The court does not find this approach particularly helpful, especially since definitions are intended to help a jury, not keep it on a revolving train of thought.

    Claim 1 states that the upper and lower portions are "integrally formed." While this indicates a joinder of the portions, it is not clear from this language alone how the joinder is accomplished, and what, if any limitations are implied. It is therefore necessary to construe the term in light of other intrinsic evidence.

The specification uses "integrally" to describe: "connected" (in the abstract and Col. 1, l. 14); "formed" (Claim 1, Col. 3, l. 46); and "joined" (Claim 4, Col. 4, l. 4-5). The patentee chose not to define these terms as equivalent or identical in the specification.

The "Background of the Invention," describes fingerjointing small pieces of wood and joining them "end to end to produce a single long piece . . . ." Col. 1, l. 47-48. The specification also stated that the wood and durable portions are "connected end to end with a glued finger joint or other mechanical connection to assemble the component." Col. 2, l. 6-7. The specification also states that the assembly of the wood portion with the durable portion "forms a complete side jamb 1 or 2." Col. 3, l. 13. These references support a definition which implies that the wooden portion and the durable portion are put together to form a single piece or unit, which is intended to be used like the single piece of lumber formerly used for door jambs.

The '209 patent is a continuation of the '943 patent and the language of claim 1 in each patent is the same except for describing the lower durable piece in the '209 patent as made of "a second material" instead of "A wood particulate that is mixed with resins" as in the '943 patent.

The prosecution history indicates that the application for what would become the '943 patent, initially merely indicated that the side jambs would have an upper and lower portions, with no reference to how they were attached. The Patent Examiner rejected the claim "under 35 U.S.C. § 102(e) as being anticipated by RAYNAK in view of HSU." RAYNAK (United States Patent No. 5,437,130) discloses a jamb made from pieces of lumber. HSU (United States Patent No. 5,553,438) discloses a wooden pole with the bottom section being pressure treated and then covered with thermoplastic.

BMS argued that the invention in this case was different, in that the durable portion was not merely pressure treated wood, or wood wrapped in plastic, but rather was "formed from" a wooden portion and a durable portion. BMS also submitted photos of the jambs showing them finger jointed to form a single piece. The Examiner issued an amendment which inserted "that are integrally formed" after "jambs having upper and lower portions . . . ." The court concludes that the claim cannot be interpreted as a wooden jamb with a piece of durable material wrapped around the wood, or as a durable piece which may be added to a wooden jamb at the discretion of the house builder or carpenter. The durable portion must be attached in a relatively permanent fashion, so that the jamb may be shortened by cutting (just like a solid wood jamb) or otherwise shaped with a tool (just like a solid wood jamb) but not merely disassembled as though the wood portion and the durable portion were interchangeable parts.

Endura argues that the definition should contain the following limitation: "as opposed to an assembly of components attached with removable fasteners, such as screws or staples." The preferred embodiment does describe finger jointing and gluing. Col. 3, l. 2-3. However, the Specification also states that "other wood joints are contemplated, such as edge gluing or their equivalents." The summary uses the phrase "connected end to end with a glued finger joint or other mechanical connection to assemble the component." Col 2, l. 6-7.[1]

---

[1] Endura raised in their Reply brief and at the *Markman* hearing an argument that the court should not consider any new language in the '209 patent specification, which was not present in the '943 parent application because it constitutes new subject matter. Endura asserts BMS did not follow the MPEP guidelines when they submitted the continuation application. At the *Markman* hearing, BMS responded that the issue is not whether the court should consider the language, but might be whether the application was actually a continuation or continuation in part. Endura decided to wait until the Reply Brief and *Markman* hearing to raise this issue, so it has not been fully presented. Therefore, the court reserves any ruling as to new subject matter, inequitable conduct, or whether the continuation is a continuation in part..

These references indicate that connections other than finger joints may be used. The fact that the preferred embodiment happens to use finger joints does not import that limitation into the claim language. While these references would not broaden the claim language to allow an easily disassembled jamb, or a structure composed of interchangeable parts, they also do not limit the claim to joints without metal fasteners. For example metal dowel rods or screws might be inserted in the end of a durable portion, running parallel to the portion into the end of the wooden portion to strengthen the glued joint. Other possibilities could be contemplated to form a joint that was relatively permanent.

Therefore the court construes this claim term as follows:

**"integrally formed"** means: "connected together so as to make up a single complete piece or unit, or so as to work together as a single complete piece or unit, and so as to be incapable of being easily dismantled without destroying the integrity of the piece or unit."

### 6. Claim 1, Element 6, "a durable moisture, decay and insect resistant material"

The parties agree on the following definition:

"A material that is able to exist for a long time without significant deterioration, and is more resistant to moisture, decay, and insects than wood."

### 7. Claim 2, Element 1, "plastic"

The parties agree on the following definition:

"Any of various organic compounds produced by polymerization, capable of being molded, extruded, cast into various shapes and films or drawn into filaments used as textile fibers."

**C. Claim 8**

The second claim in dispute is claim 8. Claim 8 is dependent on claim 4. These claims are set out with disputed terms in **BOLD**.

Claim 4 reads: A **construction component** comprising: a **first and a second portion** that are **integrally joined**, said first portion being made of wood, said second portion being a **durable material** made from a second material selected from the group consisting of materials other than wood, materials other than wood in formulation with wood particles, and wood adapted to be moisture, decay, and insect resistant.

Claim 8 reads: The construction component of claim 4, wherein the second portion is **entirely plastic**.

### 1. Claim 4, Element 1, "construction component"

The parties agree on the following definition:

"A constituent part that is incorporated into a building or structure."

### 2. Claim 4, Element 2, "**first portion** and a **second portion**"

Claim 4 deals with "construction components," rather than "frames." BMS's proposed definition is:

"'First portion' referring to a construction component that has at least two

discrete portions wherein the first portion has at least one surface in contact with

a second portion."

15

"'Second portion' referring to a construction component that has at least two discrete portions wherein the second portion has at least one surface in contact with the first portion such that the second portion substitutes a material other than natural wood for what would otherwise be natural wood."

This definition tries to describe the entire claim in the definition of two terms. There is nothing in the claim language, nor in the rest of the specification that indicates that these are technical terms, or an intent to ascribe any special meaning to first portion or second portion.

"Portion" has been defined as: "a part of any whole, either separated from or integrated with it." Websters Encyclopedic Unabridged Dictionary of the English Language 1120 (1989). "First" and "Second" are not used in any sense of place or space, such as upper and lower, and merely denote that there are separate portions. Therefore the court construes these terms as follows:

**"first portion"** means: "a part of the whole, which is less than the whole, and is distinguishable from the 'second portion.'"

**"second portion"** means: "a part of the whole, which is less than the whole, and is distinguishable from the 'first portion.'"

**3. Claim 4, Element 3, "integrally joined"**

While the word joined differs from the word "formed" as used in "integrally formed" defined above, nothing in the claim language, the rest of the specification, nor in the prosecution history indicates that they have different meanings. The door jamb of claim 1, which is "integrally formed," is not molded or extruded, but rather is shaped by cutting, like a piece of

16

wood. The "formed" refers not to shaping but to the relatively permanent connection of the wood portion to the durable portion. The same applies to the construction components of claim 4. The wood and durable portions are connected in a relatively permanent fashion. Accordingly, for the reasons set out above in discussing the definition of "integrally formed" the court construes this claim term as follows:

> **"integrally joined"** means: "connected together so as to make up a single complete piece or unit, or so as to work together as a single complete piece or unit, and so as to be incapable of being easily dismantled without destroying the integrity of the piece or unit."

**4. Claim 4, Element 4, "durable material"**

The parties agree on the following definition:

> "'Durable material' is a material that is able to exist for a long time without significant deterioration."

**5. Claim 8, Element 1, "entirely plastic"**

BMS offers no special definition of this term, but argues that it need not be separately defined. Endura proposes that the definition be "exclusively plastic with no non-plastic materials, such as metal screws or staples."

As noted above, the parties have agreed on the definition of "plastic." Nothing in the claim language, the rest of the specification, or the prosecution history, even hints that "entirely" has a special meaning or is a technical term. Endura's definition seems to be an attempt to incorporate its arguments on the types of joints that are permitted, into the definition of the non-wood "second" portion of claim 4. Some type of joint is anticipated, and the interpretation of

17

the material of the second portion is not the place to impose limitations on the way the portions are connected.

"Entirely" is defined as "wholly or fully." Websters Encyclopedic Unabridged Dictionary of the English Language 476 (1989). It is also defined as "to the full or entire extent." Meriam-Websters Collegiate Dictionary 386 (10th ed. 2002). The court will define this term as follows:

**"entirely plastic"** means: "made only of plastic."

So **ORDERED** and **SIGNED** this **11** day of **May, 2005.**

_____
Ron Clark, United States District Judge